IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEVERE ANDRE HALL, SR. | : | |
| *Plaintiff,* | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA HOUSING | : | |
| AUTHORITY et al., | : | No. 17-5753 |
| *Defendants.* | : | |

**M E M O R A N D U M**

PRATTER, J.                                                                                                       APRIL 5, 2019

Devere Andre Hall, Sr. brings claims against the Philadelphia Housing Authority and Tracy T. Hearst, who works for the PHA. Mr. Hall claims that the PHA discriminated against him and violated his due process rights when the PHA refused to house Mr. Hall because of his criminal record. But the record shows that the exact opposite is true: although the PHA initially determined Mr. Hall was ineligible for housing because he had been convicted of a homicide-related offense, the PHA reversed its decision after a hearing revealed that the offense was only a misdemeanor. Nothing in the record supports that Mr. Hall was the victim of unlawful discrimination and nothing shows that he was denied due process. The motion for summary judgment must therefore be granted.

## Background[1]

On August 4, 2016, Mr. Hall applied to be on the PHA Public Housing Waiting List.[2] Mr. Hall requested placement at the first available housing site with wheelchair accessibility. About three weeks later, Mr. Hall completed an application for PHA housing. Mr. Hall noted on the form that he needed mobility accommodations, including for a wheelchair. Mr. Hall then updated his application, reflecting a change in his phone number and email address.

At the time Mr. Hall applied for PHA housing, the PHA maintained a Program Admissions and Continued Occupancy Policy (the "Admissions Policy"), which, among other things, describes certain eligibility requirements for PHA housing applicants like Mr. Hall. The Admissions Policy states that the PHA conducts a credit check and criminal background check on all applicants. Motion, Ex. G §§ 4.18, 4.20. The Admissions Policy also states that the presence of certain factors could lead to mandatory denial.

An applicant would be mandatorily denied if:

> Any household member has been convicted of a homicide-related offense, i.e. the killing of one human being by another. This includes murder, manslaughter (voluntary or involuntary), and conspiracy to commit murder. Mandatory denial is required if the homicide related conviction is within the time frames, as described in Appendix D.

Id. § 4.20.1. Another section of the Admissions Policy further notes that "[i]f PHA proposes to deny assistance based on criminal record information, . . . [t]he applicant will have an opportunity to dispute the accuracy and relevance of the information through the informal hearing process." Id. § 4.20.

---

[1] The facts as stated in this section are based on the Court's review of the numerous exhibits attached by the defendants to their motion for summary judgment.

[2] Mr. Hall alleges in his complaint that he sought housing at the Marshall Shepard and Martin Luther King IV facilities. The record does not contain any indication that Mr. Hall specifically requested placement at these locations, but it is clear from the record that Mr. Hall did apply for PHA housing.

2

In response to Mr. Hall's application, the PHA hosted Mr. Hall for a pre-eligibility interview. The waitlist processing notes for this interview reflect that Mr. Hall attended the interview, that his file was missing several documents, and that his request to join the PHA housing waitlist was rejected. About a week after the interview, the PHA Admissions Department sent Mr. Hall a letter memorializing that his application had been rejected. The letter specifically identified two reasons for Mr. Hall's rejection:

1. "Police Record Failures Involuntary Manslaughter. Felony 'Guilty' disposition date of 9/30/1997"; and

2. "Landlord/Tenant Judgment: Action date of 11/25/2015. Plaintiff 1415 Fairmount Limited Partnership. Judgment Amount of $871.00."

Motion, Ex. L. The letter included, as attachments, a "background check" report on Mr. Hall, which included, among other things, the record of his involuntary manslaughter conviction. Id. The letter also stated that Mr. Hall was entitled to a hearing if he disagreed with the PHA Admissions Department's decision and wanted "to have the decision reviewed[.]" Id.

Mr. Hall did request a hearing with the PHA to challenge the rejection of his application. Motion, Ex. M. The PHA Admissions Department sent Mr. Hall a letter scheduling the hearing, Motion, Ex. N, but Mr. Hall's request for review was denied after he failed to appear. Motion, Ex. O. The letter sent to Mr. Hall denying his request for review was signed by Tracy Hearst, on behalf of the hearing panel. Id. Pursuant to that letter, Mr. Hall could still appeal the hearing panel's determination by filing an appeal with the Philadelphia Court of Common Pleas within 30 days of the letter. Id.

3

Although Mr. Hall would normally have to pursue his appeal of the hearing panel's decision through the courts, the PHA Admission Department sent Mr. Hall another letter scheduling a second hearing to review his ineligibility determination. Motion, Ex. P.[3]

During the hearing—with Mr. Hall in attendance—a review panel provided context to Mr. Hall about his prior rejection, including explaining to Mr. Hall that even absent his involuntary manslaughter conviction, he "would've been denied because of the landlord/tenant judgment." Motion, Ex. Q at 3. The panel also asked Mr. Hall questions about the PHA's two reasons for previously denying Mr. Hall's housing application. Mr. Hall had the opportunity, for example, to clarify that his conviction for involuntary manslaughter was a misdemeanor conviction under the state criminal code, see id. at 2–3, and to describe the circumstances precipitating the charge. Id. at 7–8. Mr. Hall also was able to add context to his landlord/tenant dispute, including his explanation that he had only missed payments because he was uncomfortable going to the rental office at his prior residence after being sexually harassed by an employee there. Id. at 3.

About two weeks after the hearing, Ms. Hearst sent a letter to Mr. Hall stating that the PHA had reversed its previous decision to deny Mr. Hall's housing application outright. See Motion, Ex. R. The PHA "overturned" its decision "as it relate[d] to [Mr. Hall's] criminal background denial" and, with regards to the landlord/tenant dispute, "granted [Mr. Hall] additional [t]ime to supply documentation showing that [he] ha[d] entered into a repayment agreement." Id. at 1. The letter also included an "Informal Admissions Hearing Decision" memorandum, which (1) stated that because Mr. Hall's involuntary manslaughter conviction was a "misdemeanor offense," it "should not have garnered his denial from the [PHA housing]

---

[3] It is unclear, from the record, what, if anything, precipitated the PHA Admission Department's decision to give Mr. Hall a second hearing date.

4

program," id. at 2, and (2) provided Mr. Hall with 30 days to "provide this hearing panel with a copy of the repayment agreement with his former landlord." Id.

After the elapse of the 30-day period for Mr. Hall to provide proof to the PHA that he had repaid his outstanding rent obligation, the PHA sent Mr. Hall another letter stating that the denial of Mr. Hall's PHA housing application had been upheld because Mr. Hall never proved that he settled the landlord/tenant issue. Motion, Ex. S at 1–2. The letter included another "Informal Admissions Hearing Decision" memorandum, explaining that Mr. Hall had not complied with the terms set forth in the previous memorandum. Id. at 2–3.

Just over a week later, Mr. Hall faxed to Ms. Hearst a rental payment agreement for the at-issue landlord tenant dispute. Motion, Ex. T. That same day, the PHA sent Mr. Hall a letter overturning its denial of Mr. Hall's PHA housing application. Motion, Ex. U. The letter, like the two previous PHA letters, included an "Informal Admissions Hearing Decision" memorandum, which explained that although Mr. Hall had initially missed the deadline to submit a repayment agreement with his former landlord, Mr. Hall had since provided a copy of a repayment agreement. Id. at 2.

Finally, in October, 2017, Mr. Hall executed a PHA lease agreement for an apartment in a PHA property. Motion, Ex. X. The lease agreement is countersigned by Mr. Hall and by a PHA property manager. Mr. Hall's complaint confirms that, at least at the onset of this litigation, he continued to live at the same PHA-run property. Compare id. with Amended Compl. at 1 (stating Mr. Hall's address); see also Answer ¶ 1.

### LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a "sufficient evidentiary basis" on which a reasonable factfinder could return a verdict for the non-moving party. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it "might affect the outcome of the case under governing law." Id. (citing Anderson, 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party and draw all inferences in that party's favor. Id. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) (citing Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Where the non-moving party bears the burden of proof on a particular issue, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the non-moving party must set forth specific facts establishing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate unless the non-moving party makes a factual showing "sufficient to establish the existence of an element essential to that

6

party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

*Pro se* litigants such as Mr. Hall are "held to 'less stringent standards' than trained counsel." Benckini v. Hawk, 654 F. Supp. 2d 310, 316 n.1 (E.D. Pa. 2009) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972)). The Court stands prepared to "apply the applicable law, irrespective of whether a *pro se* litigant has mentioned it by name." Holley v. Dep't of Veteran Affairs, 165 F.3d 244, 247–48 (3d Cir. 1999) (citations omitted). However, on a motion for summary judgment, "a *pro se* plaintiff is not relieved of his obligation under Rule 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment." Dawson v. Cook, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017) (citation omitted). "[M]erely because a non-moving party is proceeding *pro se* does not relieve him of the obligation under Rule 56(e) to produce evidence that raises a genuine issue of material fact." Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000); see also Zilich v. Lucht, 981 F.2d 694, 696 (3d Cir. 1992) (stating that despite liberal construction of the complaint, *pro se* plaintiff "still has before him the formidable task of avoiding summary judgment by producing evidence 'such that a reasonable jury could return a verdict for [him].'") (quoting Anderson, 477 U.S. at 248).

## DISCUSSION

Mr. Hall's claims for discrimination on the basis of his criminal history fall into two buckets. First, Mr. Hall raises fair housing claims under both state and federal law. Second, Mr. Hall brings claims for due process violations. Both claims fail as a matter of law, and the Court will address each in turn.[4]

---

[4] Although not raised by the defendants, the Court is skeptical that Mr. Hall has standing to litigate his claims. "Absent Article III standing, a federal court does not have subject matter

7

# I. Fair Housing Claims

Mr. Hall has not adequately alleged housing discrimination, under either federal or state law. The Fair Housing Act makes it unlawful to discriminate "because of race, color, religion, sex, familial status, or national origin," as well as on the basis of a handicap. 42 U.S.C. § 3604. The Pennsylvania Human Relations Act prohibits housing discrimination "because of . . . race, color, familial status, age, religious creed, ancestry, sex, national origin or handicap or disability[.]" 43 Pa. Stat. Ann. § 955(h).

---

jurisdiction to address a plaintiff's claims, and they must be dismissed." Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 188 (3d Cir.2006). Even where neither party addresses standing, courts "are required to raise issues of standing sua sponte if such issues exist." Steele v. Blackman, 236 F.3d 130, 134 n.4 (3d Cir. 2001) (citing FOCUS v. Allegheny Cnty. Court of Common Pleas, 75 F.3d 834, 838 (3d Cir. 1996)).

Article III standing requires "(1) injury-in-fact, which is an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 290–91 (3d Cir. 2005). Here, it is doubtful that Mr. Hall can establish any injury-in-fact.

"The sole requirement for standing to sue under the Fair Housing Act is the Art. III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a distinct and palpable injury.'" Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers, 141 F.3d 71, 75 (3d Cir. 1998) (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982)). Although the PHA initially denied Mr. Hall's request for housing, the PHA reversed that decision and granted Mr. Hall's PHA housing application. Indeed, Mr. Hall's address—which he provided in the complaint—is the address for a PHA-owned facility. Compare Motion, Ex. X (lease between Mr. Hall and PHA) with Amended Compl. at 1 (stating Mr. Hall's address). As such, the only potential injury that Mr. Hall can possibly establish is that he "missed [the] opportunity to move in Marshal Shepard and the Martin Luther King [facilities]" because of the PHA's delay in granting his application. Amended Compl. at 3. Upon consideration of Mr. Hall's *pro se* status, and because it is at least hypothetically possible that Mr. Hall experienced some "distinct and palpable injury" from his placement in housing *other than* the Marshal Shepard or Martin Luther King facilities, the Court will assume *arguendo* that Mr. Hall has suffered an injury-in-fact and will proceed to the merits of Mr. Hall's claims. But if the record includes an Article III injury, it is by only the narrowest of margins.

8

Mr. Hall alleges only that the PHA discriminated against him on the basis of his criminal history, and as such the PHA's housing policies do not facially violate the FHA or PHRA. See Talley v. Lane, 13 F.3d 1031, 1034 (7th Cir. 1994) ("The Fair Housing Act does not require that a dwelling be rented to an individual who would constitute a direct threat to the health and safety of other individuals or whose tenancy would result in substantial physical damage to the property of others. Thus, it is within the [housing agency's] discretion to find that individuals with a history of convictions for property and assaultive crimes would be a direct threat to other tenants and to deny their applications.") (citation omitted); see also Corley v. Jahr, No. 11-9044, 2013 WL 1453367, at *2 (S.D.N.Y. Mar. 28, 2013) (dismissing claims under FHA where plaintiff was denied based on his "felony conviction and poor credit"). Nor has Mr. Hall alleged a cause of action for—let alone established any facts supporting—a disparate impact claim of housing discrimination. See generally Amended Compl.[5]

---

[5] Out of an abundance of caution, the Court will briefly explain that the record does not support a claim for housing discrimination under a disparate impact theory. The United States Department of Housing and Urban Development ("HUD") recently issued two guidance documents suggesting that the use of arrest and conviction records may violate the FHA by disparately impacting minorities. The record here, however, does not support determining that the PHA's use of criminal history causes a disparate impact on any protected class or protected class member.

The first guidance document, issued by the Office of Public and Indian Housing on November 2, 2015, focused on the use of arrest records in scrutinizing housing applications. See HUD Notice PIH 2015-19: Guidance for Public Housing Agencies (PHAs) and Owners of Federally-Assisted Housing on Excluding the Use of Arrest Records in Housing Decisions, (Nov. 2, 2015), available at http://portal.hud.gov/hudportal/documents/huddoc?id=PIH2015-19.pdf (the "November 2, 2015 Guidance"). The November 2, 2015 Guidance "inform[ed] [Public Housing Agencies] and owners of other federally-assisted housing that *arrest* records may not be the basis for denying admission." Id. at 2 (emphasis added). The November 2, 2015 Guidance also identified admission policies that "limited their criminal record screening to assessments of *conviction* records" as exemplifying a best practice. Id. at 5 (emphasis added). The PHA did not use Mr. Hall's arrest records in assessing his application, and so the November 2, 2015 Guidance is not implicated in this case.

The second guidance document, issued on April 4, 2016, stated that the use of *criminal history* may have a disparate impact on minority communities and may therefore violate the

9

Mr. Hall's federal and state claims for fair housing violations fail as a matter of law and must be dismissed.

---

FHA. See UD Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-related Transactions, (Apr. 4, 2016), available at https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF (the "April 4, 2016 Guidance"). The April 4, 2016 Guidance observed that "[w]hile having a criminal record is not a protected characteristic under the Fair Housing Act, criminal history-based restrictions on housing opportunities violate the Act if, without justification, their burden falls more often on renters or other housing market participants of one race or national origin over another (i.e., discriminatory effects liability)." Id. at 2. "Thus, where a policy or practice that restricts access to housing on the basis of criminal history has a disparate impact on individuals of a particular race, national origin, or other protected class, such policy or practice is unlawful under the Fair Housing Act if it is not necessary to serve a substantial, legitimate, nondiscriminatory interest of the housing provider, or if such interest could be served by another practice that has a less discriminatory effect." Id.

Mr. Hall does not allege, and nothing in the record establishes, that the PHA's criminal history policy has a disparate impact on any protected class members. See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507, 2523 (2015) ("A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection [between protected class membership and alleged discriminatory effect] cannot make out a prima facie case of disparate impact."); see also April 4, 2016 Guidance at 3 ("In the first step of the [disparate impact] analysis, a plaintiff (or HUD in an administrative adjudication) must prove that the criminal history policy has a discriminatory effect, that is, that the policy results in a disparate impact on a group of persons because of their race or national origin.").

The record only establishes that Mr. Hall was a member of one protected class: those with a handicap. See 24 CFR § 100.500(a) ("A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin."). Mr. Hall applied for wheelchair accessible housing. See Motion, Ex. H. Nothing in the record suggests that a ban on residents with convictions for homicide-related offenses disparately impacts disabled persons.

The record does not establish Mr. Hall's membership in any other protected class. The only reference in the record to Mr. Hall's race (or any other protected class membership) appears to be on his criminal background check, which lists his race as "Unknown/Unreported." Motion, Ex. Q at 10. Mr. Hall cannot reach even the first step of the analysis set forth in the April 4, 2016 Guidance and the Supreme Court's disparate impact caselaw. Thus, the Court need not consider (1) what impact—if any—the PHA's Admissions Policy had on protected class members and (2) whether the Admissions Policy is narrowly tailored to serve a substantial government interest.

## II. Due Process Claims

In addition to his fair housing claims, Mr. Hall also alleges generally that the PHA violated his due process rights. Because Mr. Hall does not specify whether the PHA allegedly violated procedural or substantive due process, the Court analyzes both and determines that Mr. Hall can prove a violation of neither.

### A. Procedural Due Process

When a plaintiff alleges that a state actor failed to provide procedural due process, courts employ a "familiar two-stage analysis," Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984), inquiring "(1) whether the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property; and (2) whether the procedures available provided the plaintiff with due process of law." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000) (quotations omitted).

At the first stage of the analysis, the Court will "assume, without deciding, that [a public housing applicant] plaintiff has a cognizable property interest [in public housing] sufficient to implicate the due process clause." Johnson v. Philadelphia Hous. Auth., No. 93-2296, 1993 WL 544408, *6 (E.D. Pa. Dec. 30, 1993); see also Baldwin v. Hous. Auth. of City of Camden, NJ, 278 F. Supp. 2d 365, 378 (D.N.J. 2003) (collecting cases "accord[ing] procedural due process protection to applicants for benefits who did not have present enjoyment of the benefit"). As to the second stage, i.e., whether Mr. Hall received due process of law, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333 (1976).

A reasonable factfinder could only conclude that Mr. Hall received a meaningful opportunity to be heard on his application for public housing. Although it is true that the PHA

11

originally denied Mr. Hall's housing application because of his conviction for involuntary manslaughter, see Motion, Ex. L, at least three facts show that the PHA meaningfully allowed Mr. Hall to be heard. First, the PHA's letter initially denying Mr. Hall's application clearly stated that Mr. Hall could appeal the PHA's decision and receive a hearing on his appeal. Motion, Ex. L. Second, the PHA scheduled two separate hearings to review Mr. Hall's rejection, even scheduling the second hearing after Mr. Hall apparently failed to appear at the first hearing. See Motion, Ex. N–P. And third—and most conclusively—after a thorough hearing discussing Mr. Hall's criminal history (and the rejection generally), see Motion, Ex. Q, the PHA reversed its decision and accepted Mr. Hall's application for housing. See Motion, Exs. R, U. Given the ultimate outcome of the PHA's review of Mr. Hall's application, it is hard to imagine a more meaningful opportunity to be heard than one that results in the reversal of the initial negative decision. Simply put, any reasonable factfinder would determine that the PHA provided Mr. Hall with due process of law.

### B. Substantive Due Process

The touchstone of substantive due process is "the protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974). "To generate liability, [state] action must be so ill-conceived or malicious that it 'shocks the conscience.'" Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)). "The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." Id.

Here, no factfinder would determine that the PHA's conduct was anywhere near conscience-shocking. The PHA's policy not to provide housing to individuals convicted of homicide-related offenses manifests "an effort to prevent future drug-related and other criminal

12

activity, as well as other patterns of behavior that pose a threat to the health, safety or right to peaceful enjoyment of the premises by other residents[.]" Motion, Ex. G § 4.20. Moreover, as stated in the PHA's Admissions Policy, even where an applicant is denied because of criminal history, the applicant can challenge the rejection. Id. Mr. Hall's case is the poster-child for a successful challenge through the hearing process: Mr. Hall successfully overturned his rejection by presenting evidence that although he had been convicted of a homicide-related offense, his conviction was in fact a misdemeanor and therefore he was not deemed to be a danger to other PHA residents. Motion, Exs. Q, R. Neither the PHA's Admissions Policy nor its application thereof to Mr. Hall could shock the conscience of a reasonable factfinder, and so Mr. Hall's substantive due process claim must be dismissed.[6]

### III. Mr. Hall's Outstanding Motions

In addition to the defendants' motion for summary judgment, there are several other motions outstanding, all brought by Mr. Hall. First, Mr. Hall seeks leave to amend his complaint to add as a defendant Shelba Bennett, whom Mr. Hall identifies as a PHA Admissions Officer. See Doc. No. 20. Because adding Ms. Bennett would be futile,[7] the Court will deny the motion. See Harris v. Steadman, 160 F. Supp. 3d 814, 817 (E.D. Pa. 2016) ("Leave should be granted unless: (1) an amendment would be futile . . . . Amendment is futile if a proposed amended complaint is frivolous or advances a claim or defense that is legally insufficient on its face.")

Second, Mr. Hall requests appointment of counsel. "The Supreme Court has not recognized nor has the court of appeals found a constitutional right to counsel for civil litigants."

---

[6] The defendants also argue that Mr. Hall has failed to satisfy the requirements for organizational liability under Monell v. New York City Department of Social Services, 436 U.S. 658 (1978). Because the Court determines that there is no underlying constitutional violation, the Court need not analyze whether Mr. Hall can establish liability under Monell.

[7] As discussed above, Mr. Hall does not have any cognizable claims, whether against the PHA or its employees.

Parham v. Johnson, 126 F.3d 454, 456 (3d Cir. 1997). The Court may, as a matter of its discretion, *choose* to appoint counsel for plaintiffs proceeding *in forma pauperis*. 28 U.S.C.A. § 1915(e)(1). "'[T]he appointment of counsel for an indigent plaintiff in a civil case . . . is discretionary with the court and is usually only granted upon a showing of special circumstances indicating the likelihood of substantial prejudice to him resulting, for example, from his probable inability without such assistance to present the facts and legal issues to the court in a complex but meritorious case.'" Tabron v. Grace, 6 F.3d 147, 154 (3d Cir. 1993) (quoting Smith–Bey v. Petsock, 741 F.2d 22, 26 (3d Cir. 1984)). In determining whether a district court should appoint counsel, the Third Circuit Court of Appeals points to a two-phase analysis that courts should employ: "As a preliminary matter, the plaintiff's claim must have some merit in fact and law. If the district court determines that the plaintiff's claim has some merit, then the district court should consider [several] factors[.]" Parham, 126 F.3d at 457 (citations omitted). Here, as discussed above, Mr. Hall's claims do not have merit. He is not entitled to appointment of counsel.

Third and finally, Mr. Hall moves for summary judgment and/or default judgment.[8] Mr. Hall does not identify any basis for his motion for summary judgment. He merely restates his belief that it was improper for the PHA to rely on his conviction for involuntary manslaughter in initially denying his application for public housing. See Doc. No. 22. But the record contains no facts supporting Mr. Hall's claims and instead establishes that the PHA (1) did not violate state or federal fair housing laws and (2) did not violate substantive or procedural due process.

---

[8] Although it is unclear, the Court suspects that Mr. Hall's cross-motion for summary judgment is intended to function as an opposition to the defendants' motion for summary judgment.

## Conclusion

There is no evidence that the PHA's criminal history policy violates state or federal fair housing laws or the Constitution. Mr. Hall's case presents an example of due process at work. Although the PHA may have erred in its initial decision to deny Mr. Hall's application for public housing, the PHA corrected that decision after giving Mr. Hall a meaningful opportunity to demonstrate the PHA's error.

For the foregoing reasons, the defendants' motion for summary judgment is granted and Mr. Hall's pending motions are denied. An appropriate order follows.

BY THE COURT:

*/s/ Gene E.K. Pratter*
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE